**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**(Northern Division)**

| | | |
|---|---|---|
| **In re:** <br><br> **RPM FINANCIAL, LLC,** <br> **Debtor.** | ) <br> ) <br> ) <br> ) <br> ) | **Case No. 11- 30545 -** <br> **(Chapter 11)** |
| **In re:** <br><br> **DIAMOND QUALITY STORES, LLC,** <br> **Debtor.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Case No. 11- 30546 -** <br> **(Chapter 11)** |
| **In re:** <br><br> **TRAILER SALES, INC.,** <br> **Debtor.** | ) <br> ) <br> ) <br> ) <br> ) <br> ) | **Case No. 11- 30547 -** <br> **(Chapter 11)** |

**AFFIDAVIT OF KENDRICK RAY MCCULLOUGH**
**IN SUPPORT OF FIRST DAY MOTIONS**

COUNTY OF MONTGOMERY )
STATE OF ALABAMA )

KENDRICK RAY MCCULLOUGH, being duly sworn, deposes and says:

1. I, KENDRICK RAY MCCULLOUGH, am the founder and owner of each of the debtors and debtors-in-possession in the above-captioned Chapter 11 cases.

2. In order to enable the Debtors to operate effectively and to avoid potential adverse effects of their Chapter 11 filings, the Debtors have requested various types of relief in applications and motions (the "First Day Motions") filed with the Court concurrently with this affidavit. The Debtors

00229666

recognize that certain of the First Day Motions will be subject to notice requirements that will preclude them from being heard by the Court at the first day hearing. Nevertheless, to provide a more complete overview of the relief being sought, all of those applications and motions are discussed in this affidavit and, for convenience, are referred to as First Day Motions. I submit this affidavit in support of those First Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to it in the relevant First Day Motion. Except as otherwise indicated, all facts set forth in this affidavit are based on my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If I were called upon to testify, I could and would testify competently to the facts set forth in this affidavit.

3. "Part I" of this affidavit describes the Debtors' businesses and the circumstances surrounding the filing of their Chapter 11 petitions. "Part II" provides an overview of the relief that will be sought in the early stages of these cases. "Part III" sets forth the relevant facts in support of the Debtors' First-Day Motions.

## I. BACKGROUND

4. In 1995, Kendrick Ray McCullough ("Ray McCullough"), the affiant herein formed Hi-Ridge Transport, Inc., which is a gasoline hauling business. He formed another business in 2001originally named Horizon Gas Co., Inc., for the purpose of buying and selling gas. The name of Horizon Gas Co., Inc., was changed in 2003 to Trailer Sales, Inc. In December of 2004, Ray McCullough formed two companies to acquire and operate convenience stores. The acquisition company which was named RPM Financial, LLC, acquired the real estate and leased it to USA Travel Centers, LLC, which was the operating company. As explained below, Diamond Quality

00229666

Stores, LLC, was formed by Paula McCullough in 2010 to receive the assignment of several of the leases on the convenience stores from USA Travel. In 2007 Ray McCullough formed an additional company named Bulk Material, LLC, to broker and haul aggregate material. Along the time line two other companies were formed as adjuncts to the others: RM Birmingham, LLC, was formed to handle construction activities as a licensed building contractor, and The Truck Shop, Inc., was acquired to operate a truck repair shop.

**Related Operations**

5. As the business progressed, the companies, though all related, fell into three non-distinct groups: (1) the "Convenience Store Group," (2) the "Transport Group," and (3) the "Services Group". For identification purposes these entities will be referred to collectively as the "Ray McCullough Companies."

6. The Convenience Store Group consists of RPM Financial, LLC ("RPM"); Diamond Quality Stores, LLC ("Diamond"); Trailer Sales, Inc. ("Trailer Sales")[1]; and USA Travel Centers, LLC ("USA Travel"). RPM is the owner of 18 convenience store sites. USA Travel formerly had the leases on all 18 of the convenience store locations as the lessee of RPM. USA Travel allowed 9 of the stores to be leased to Diamond. One of these Diamond Stores has been closed and the other 8 are operating. All of the stores not leased to Diamond were closed by USA Travel and USA Travel has surrendered the leases on these closed stores to RPM. As of the date of the filing of Chapter 11

[1] Trailer Sales could be included in either the Convenience Store Group or the Transport Group and probably should be considered a member of both groups. Trailer Sales has sold gas to the members of both groups for which it is owed money, and, in turn, Trailer Sales owes money to various gas suppliers, bonds, and letters of credit supporting gas supply. A portion of the debt of Trailer Sales is allocable to the Transport Group and should be calculated and allocated to the proper obligor.

there are 8 operating stores. USA Travel, being no longer active and having no assets of value, is not filing bankruptcy, but may file later if needed to orderly liquidate. The other members of the Convenience Store Group, which include all of the active members of the group, are included as Debtors in this bankruptcy filing.[2]

7. For informational purposes, the Transport Group consists of Bulk Material, LLC ("Bulk Material"), Hi-Ridge Transport, LLC ("Hi-Ridge"), and Ray McCullough. Bulk Material, Hi-Ridge and Ray McCullough are not currently filing bankruptcy. Further regarding the Transport Group, at the height of the activity of the Transport Group, Hi-Ridge had 70 truck tractors and 75 Tanker trailers for hauling gas. Bulk Material had 60 Truck tractors and 60 trailers for hauling aggregate. The Services Group consists of RM Birmingham, LLC, which was formed to handle construction activities as a licensed building contractor and The Truck Shop, Inc.was acquired to operate a truck repair shop.

8. With regard to both the Convenience Store Group and the Transport Group, the profit margins of the businesses were highly dependent on gas prices. As to the Convenience Store Group specifically, the industry began to show signs of contraction shortly after the stores were financed in August of 2007. The companies were still able to hold their own until the recession hit shortly thereafter and took a further hit when the oil spill occurred.

9. These business effects have caused the values of the convenience stores to fall. The secured debt on the stores is substantially higher than the value of the stores. The stores owned by

---

[2] Ray McCullough could also be considered a member of the Convenience Store Group because he is a guarantor on the Colonial Pacific loan, but he is being placed in the Transport Group because his assets are pledged as security for the Transport Group's loan to Covington County Bank.

RPM and operated by USA Travel began to lose money and were not able to pay the debts in the recession. After several loan modifications and workouts, including the current forbearance, the parties have been unable to agree on the proper course.

10. Similarly, with regard to the Transport Group, the recession drastically affected the value of trucks. When the Transport Group lost business and payment of receivables slowed, there was no way to sell trucks without suffering substantial losses. Hi-Ridge was forced under threat of repossession to either surrender its trucks or find ways to sell them to someone who would make the payments. Obviously no one would take over payments on a truck with negative equity, but some trucks were sold in this manner before they reached the point of negative equity. Ray's son, Michael Derek McCullough, formed a company named Bulk Material and Transport, LLC ("Bulk Material and Transport"), to attempt to continue both the aggregate and petroleum hauling business. The existence of Bulk Material and Transport is disclosed herein and the origin and activity of that company will be disclosed herein in order to give creditors and the court full disclosure. Bulk Material and Transport has bought or leased from Bulk Material and Hi-Ridge trucks and trailers which would have otherwise been repossessed.

11. Ray McCullough tried to acquire new and/or used trucks at lower prices, but the Bulk Material and Hi-Ridge hauling business had also become unprofitable. With regard to Bulk Material, there was little hope of turning around the profitability of the business in time for Bulk Material to keep its trucks running. Bulk Material has allowed repossession or take over of payments on its trucks and trailers. Hi-Ridge had two sets of trucks and tanker trailers. On one set of trucks and trailers, Bulk Material and Hi-Ridge could not work out arrangements with the lender, and those trucks are currently parked. The other set of trucks and tankers were owned by Hi-Ridge and

financed by Bancorp. This set, along with an agreement that Ray McCullough and Hi-Ridge would not haul petroleum in the market for 3 years, was recently sold to Keenan (KAG) in exchange for enough to payoff Bancorp.

12. Once Bulk Material could not continue in the business of hauling aggregate, it relegated its operation to functioning strictly as a broker for aggregate hauling projects.

13. Hi-Ridge recently shut down its gas hauling operation. The trucks and trailers belonging to Hi-Ridge are currently subject to collection efforts as described below.

14. As a result of these factors, the Ray McCullough Companies have faced severe financial pressures. The Ray McCullough Companies have engaged in an ongoing and extensive effort to review its operations and cut expenses in an effort to maintain sufficient liquidity to withstand the downturn in the economy.

15. Over the last several months, the Ray McCullough Companies have had ongoing and repeated meetings with its vendors and lenders and has tried to negotiate forbearance agreements and/or reasonable payment plans with each of them. Additionally, the Ray McCullough Companies have hired financial analysts to review and research accounting efforts and compile reports for its secured creditor and have been working closely with its secured lender to meet its obligations. Despite its best efforts, however, the Ray McCullough Companies have been unable to resolve its liquidity crisis outside the bankruptcy forum. Accordingly, the Debtors are filing their Chapter 11 petitions to preserve and maximize the value of their assets, as well as to ensure that both secured and unsecured creditors are protected.

**Prepetition Funding of the Debtors' Convenience Store Operations and Transport Group Operations**

16. At the outset of the convenience store business, financing came from a variety of sources

including owner financing. In August 2007, Citicorp Leasing, Inc. ("Citi"), made a loan to finance the assets and operations of the Convenience Store Group covering all of the convenience store properties and providing a credit line for operating capital. The loan was in an amount of "up to $19,000,000." The balance on this loan is approximately $15,000,000. Effective August 1, 2008, Citicorp Leasing, Inc., was acquired by GE Capital Financial, Inc., and on August 4, 2008, the name of Citicorp Leasing, Inc., changed to GE Capital Commercial, Inc. ("GECCI"). The loan has now been assigned by GECCI to Colonial Pacific Leasing Corporation ("Colonial Pacific").

17. Another lender to the Convenience Store Group is Paula McCullough who, being the wife of Ray McCullough, is a related party to this bankruptcy. The origin of the loan to Paula McCullough began with a request by GECCI for USA Travel to clear a security interest referenced by a UCC in favor of First Lowndes Bank covering the inventory of the convenience stores. USA Travel could not pay the debt which was in the approximate amount of $360,000.

(a) Ray McCullough, as part of an effort to work out the GECCI request and other problems which were arising in the financing of the convenience stores, (i) requested of his wife, Paula McCullough, that she use funds of hers in the amount of approximately $360,000 to clear the UCC held by First Lowndes Bank, and (ii) requested of GECCI that the investment be structured as an assignment of 8 to 10 of the convenience store leases to a new entity owned by Paula McCullough named Diamond Quality Stores, LLC. Ray's reason for the requests were that he could not find financing elsewhere, that the stores involved needed to be re-branded, and that the other stores needed to be shut down and either leased or sold.

(b) Both requests were agreed to by Paula McCullough and verbally by GECCI. In the summer of 2010, Paula McCullough proceeded to form Diamond with $360,000 in capital.

Diamond signed leases and used the $360,000 to buy the inventory from USA Travel which in turn paid off First Lowndes Bank and cleared the UCC.

(c) USA Travel had already begun re-branding the stores upon the verbal approval of the Diamond leases by GECCI. USA Travel had also begun closing unprofitable stores in an orderly progression when it was determined that GECCI, though having insisted that the inventory loan to First Lowndes be paid off, would not agree in writing to the lease assignments to Diamond or the closing of stores by USA Travel.

(d) At the end of the 2010, GECCI assigned the debt to Colonial Pacific, which entered into a forbearance agreement for three months. The forbearance agreement (as it pertains to Paula McCullough and Diamond) required that a reverse bill of sale for the inventory be given from Diamond to USA Travel. Additionally, Diamond was added as a guarantor of the Colonial Pacific debt. In conjunction with the forbearance agreement, the membership interest of Diamond was conveyed from Paula McCullough to Ray McCullough and the investment of Paula McCullough was reduced to a secured debt evidenced by a note for $360,000 and a security interest in the inventory of the Diamond convenience stores. Paula McCullough's note contains a default provision which allows her to declare a default should Colonial Pacific declare a default in the forbearance agreement. The lease assignments to Diamond were agreed to by Colonial Pacific, but the term of the leases were shortened to the term of the forbearance agreement which was through March 31, 2011. Since January 1, 2011, there have been defaults under the forbearance agreement, and Colonial Pacific has declared default in the forbearance agreement on at least two occasions. Following the last declaration of default, Paula McCullough conditionally declared her note in default while stating that if bankruptcy were filed she would agree to be the Debtor in Possession to the extent of

$250,000 if approved by the court so long as her loan would be secured by the inventory under regular state law priorities or by super priority afforded by the bankruptcy filing. Toward this end, Diamond declared default on its note against USA giving Diamond has the right to repossess the inventory of USA. Diamond has not repossess the inventory. Further toward this end, Diamond has repaid Paula McCullough the balance of her note ($240,000) in exchange for her agreement to serve as DIP lender in the amount of $250,000 so long as her loan would be secured by the inventory under regular state law priorities or by super priority afforded by the bankruptcy filing. The motion for approval of the DIP loan requests the court to approve Paula McCullough as DIP lender secured by the inventory in the convenience stores. As a result, if approved by the court, the inventory which is in the stores will remain subject to a security interest in favor of Paula McCullough (as DIP lender), but the owner of the inventory will Diamond instead of USA Travel.

18. The current status of the Colonial Pacific loans are as follows: As of December 31, 2010, the Debtors (USA Travel, RPM and Trailer Sales) were liable to Colonial Pacific in the following principal amount: The loan is based on 19 separate notes (reflective of the 18 store locations, one of the locations which has 2 stores on site) which cumulatively have an outstanding balance of approximately $15,000,000.

19. The main assets and operations of the Transport Group are currently financed by Covington County Bank. Bulk Material, Hi-Ridge and Ray McCullough have proposed a sale of the collateral held by Covington County Bank to a related party Bulk Material and Transport, LLC. At one time there was financing from First Lowndes Bank, which recently went under FDIC control. Additionally, some trucks and trailers were financed through leasing companies, but the acquiring companies had difficulty paying the leases and those leases were either abandoned or taken over by

Bulk Material and Transport, LLC.

## II. OVERVIEW OF EARLY-STAGE RELIEF TO BE REQUESTED

20. Prior to filing their petitions, the Debtors obtained a commitment from Paula McCullough for an operating line in the amount of $250,000, secured by inventory of the convenience stores. The terms of that financing are set forth in a Motion for Approval of DIP Financing that is being filed on the same day as the Chapter 11 petitions. Assuming the proposed DIP financing is approved, the Debtors expect to have sufficient liquidity to continue operating their business in the ordinary course during the Chapter 11 case.

21. The Debtors are preparing a Chapter 11 plan of reorganization that will be funded by the sale of certain assets, as well as the Debtors' ongoing operations. The Debtors hope to emerge from a Chapter 11 reorganization with a more streamlined business which can be supported through normal business operations.

## III. FACTS IN SUPPORT OF FIRST-DAY MOTIONS

22. Concurrently with the filing of their Chapter 11 petitions, the Debtors have filed First Day Motions for the Court's approval, which your affiant on advice of counsel believes are necessary to enable them to operate in Chapter 11 with a minimum of disruption and loss of productivity. The relief sought in each First Day Motion is critical to the Debtors' ultimate goal of maximizing the value of their assets for the benefit of their creditors and estates. Each motion is listed in the next numbered paragraph and then described separately in following paragraphs with the facts which necessitate or support the relief requested set out motion by motion.

23. The First-Day Motions are as follows:

***Procedural Motions***

**First Day Hearing Motion** - Motion for Entry of an Order Setting an Expedited Hearing on "First Day Motions" and Related Relief

**Joint Administration** - Motion for Entry of an Order Pursuant to Fed.R.Bankr.P. 1015(b) Directing Joint Administration

***Professional Retentions***

**Retention of Counsel** – Application to Employ Kaufman Gilpin McKenzie Thomas & Weiss, PC, as Counsel

***Operational Motions***

**DIP Financing** – Motion for Entry of an Interim Order (I) Authorizing Post-Petition Financing; (II) Authorizing the Debtor's Use of Cash Collateral; (III) Granting Adequate Protection; and (IV) Setting Final Hearing

**Cash Management** - Motion for Authorization to Continue Using Their Existing Cash Management System, Bank Accounts and Business Forms

**Wages and Employee Benefits** - Motion of the Debtors for an Order (A) Authorizing, but Not Directing the Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests

**Insurance Coverage** – Motion for Entry of an Order Authorizing the Debtors to (a) Continue Insurance Coverage Entered into Prepetition, and (b) Enter into New Insurance Policies through the Renewal of the Current Insurance Policies or Purchase of New Policies,

**Taxes** – Motion for Entry of an Order (A) Authorizing, But Not Directing, the Debtors to Remit and Pay Certain Taxes and Fees and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests

**Deliveries** - Motion for Entry of an Order (i) Granting Administrative Expense Status to Obligations Arising From Postpetition Delivery of Goods; (ii) Establishing Authority to Pay Certain Expenses in the Ordinary Course of Business; and (iii) Establishing Procedures for Addressing Reclamation Demands.

00229666

A description of each of the First-Day Motions follows, in the order that they are listed above:

**Motion for Entry of an Order Pursuant to Fed.R.Bankr.P. 1015(b) Directing Joint Administration**

24. By this motion, the Debtors seek joint administration of their Chapter 11 cases (four in total) for procedural purposes only. I have been advised by legal counsel that the Debtors are "affiliates," as defined in Section 101(2) of the Bankruptcy Code. The business operations and reorganization efforts of the Debtors are interdependent, and their general administration and operational expenses are shared.

25. Thus, I believe that joint administration of the Debtors' cases will avoid the need for duplicate notices, applications, and orders, thereby saving considerable time and expense for the Debtors and their estates. Furthermore, I believe that joint administration will not adversely affect the rights of the Debtors' respective creditors because each Debtor's assets will remain segregated in its individual estate.

**Motion for Entry of an Order Setting an Expedited Hearing on "First Day Motions" and Related Relief**

26. By this motion, the Debtors seek a hearing, on an expedited basis, before the Court on the First Day Motions. The Debtors request that the Court deem the Debtors' notice of filing of Chapter 11 petitions and First Day Motions and of proposed hearing on First Day Motions to be adequate and appropriate notice under the circumstances. The Debtors further request that the requirement of filing a written response to the First Day Motions be waived for those matters heard at the initial hearing. This relief is necessary so that the Debtors can continue to operate their businesses with minimal disruption.

**Debtors' Application to Employ Kaufman Gilpin McKenzie Thomas & Weiss, PC, as Counsel**

27. By this application, the Debtors seek to retain and employ Kaufman Gilpin McKenzie Thomas & Weiss, PC, as their counsel with regard to the prosecution of these Chapter 11 cases and all related matters. The Debtors need representation and seek to retain Kaufman Gilpin McKenzie Thomas & Weiss, PC, as their counsel because of Kaufman Gilpin McKenzie Thomas & Weiss, PC's knowledge and experience in the field of bankruptcy and creditors' rights law. Furthermore, Kaufman Gilpin McKenzie Thomas & Weiss, PC, has represented the Debtors prior to the filing of these cases in negotiations with their creditors and has gained familiarity with the Debtors' businesses, finances and creditors. For these reasons, the Debtors believe that Kaufman Gilpin McKenzie Thomas & Weiss, PC, is well-qualified to represent them in these bankruptcy cases.

28. The Debtors propose that Kaufman Gilpin McKenzie Thomas & Weiss, PC, render the following professional services to the Debtors: (a) advise the Debtors with respect to the powers and duties as debtors-in-possession in the continued operation of their business and management of their property; (b) attend meetings and negotiate with representatives of creditors and other parties-in-interest; (c) take all necessary actions to protect and preserve the Debtors' estates, including the prosecution of actions on the Debtors' behalf, the defense of any actions commenced against the Debtor(s), negotiations concerning litigation in which the Debtors are involved, and objections to claims filed against the Debtors' estates; (d) assist the Debtors in connection with preparing necessary motions, answers, applications, orders, reports, or other legal papers necessary to the administration of the estates, and to appear in Court on behalf of the Debtors in proceedings related thereto; (e) assist the Debtors in the preparation of their Chapter 11 plan and disclosure

statement, and in any and all other matters and proceedings in connection therewith, including attending court hearings; (f) represent the Debtors in matters which may arise in connection with their business operations, financial and legal affairs, dealings with creditors and other parties-in-interest, sales and other transactional matters, litigation matters and in any other matters which may arise during these bankruptcy cases; and (g) perform all other necessary legal services in connection with the prosecution of these Chapter 11 cases.

29. The Debtors, subject to the provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, propose to pay Kaufman Gilpin McKenzie Thomas & Weiss, PC, its customary hourly rates for services rendered, as those rates may be adjusted from time to time, and to reimburse Kaufman Gilpin McKenzie Thomas & Weiss, PC, for its reasonable, necessary expenses.

30. The Debtors understand that Kaufman Gilpin McKenzie Thomas & Weiss, PC, is a "disinterested person" as defined in Section 101(14) of the Bankruptcy Code.

**Motion of the Debtors for an Order (A) Authorizing, but Not Directing the Debtors to Pay Certain Prepetition (I) Wages, Salaries and Other Compensation, (II) Reimbursable Employee Expenses, and (III) Employee Medical and Similar Benefits and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor All Related Checks and Electronic Payment Requests**

31. By this motion, the Debtors seek authority, to be exercised in their sole discretion, to pay and honor certain prepetition claims for, among other amounts, wages, salaries, commissions, and other compensation, (a) authorizing, but not directing, the Debtors to pay certain pre-petition (i) wages, salaries, and other compensation, (ii) reimbursable employee expenses and (iii) employee medical and similar benefits (collectively, the "Employee Wages and Benefits") and to pay all costs incident to the foregoing. The Debtors also seek authority, to be exercised in their sole discretion,

to continue to reimburse employees for various reimbursable expenses. In addition, the Debtors request the right to modify, change and discontinue any of the Employee Wages and Benefits, and the policy related to reimbursable expenses, and to implement changes in the Employee Wages and Benefits in the ordinary course of business during these Chapter 11 cases in their sole discretion without the need for further Court approval.

32. The Debtors request this relief pursuant to Sections 105(a), 363(b), 507(a)(4), 507(a)(5), 541(b) and 1129(a)(9)(B) of the Bankruptcy Code.

33. Debtor has two general types of employees – salaried, hourly, and commission. Debtor has approximately 52 salaried and hourly employees. Of these employees, 47 are store level and 5 are administrative. These employees are paid on a weekly basis, 13 days in arrears. Pay day is Friday and the work week is Sunday to Saturday. The most recent pay day was Friday, February 25, 2011, for the week of Sunday, February 6, 2011 - Saturday, February 12, 2011. The paychecks for salaried and hourly employees are scheduled to be issued on March 4, 2011. The approximate total amount due to salaried and hourly employees each weekly pay period, inclusive of benefits, is $19,900.

34. The Debtors do not have commissioned employees.

35. The Debtors do not have or maintain regular relationships with any independent contractors.

36. The Debtors also customarily reimburse employees who incur business expenses, such as travel and parking expenses, in the ordinary course of performing their duties on behalf of the Debtors. The Debtors estimate that as of the Commencement Date the reimbursement obligations to be paid to Employees are nominal.

37. Certain of the Debtors' employees have received cash advances on their salary. For those

employees, a deduction is being made from the employee's salary each bi-weekly pay period, until the advance is paid in full.

38. The Debtors also request the right to modify, change and discontinue any of the Employee Wages and Benefits, and the policy related to reimbursable expenses, and to implement changes in the Employee Wages and Benefits, in the ordinary course of business during these Chapter 11 cases in their sole discretion without the need for further Court approval.

49. The Debtors believe that any delay in paying prepetition employee obligations will adversely impact the Debtors' relationship with their employees and will irreparably impair the employees' morale, dedication, confidence, and cooperation.

50 The employees' support is critical to the success of the Debtors' reorganization efforts. At this early stage, the Debtors simply cannot risk the substantial damage to their businesses that would inevitably result from a decline in the employees' morale attributable to the Debtors' failure to pay wages, salaries, benefits and other similar items.

**Motion for Entry of an Order Authorizing the Debtors to (a) Continue Insurance Coverage Entered into Prepetition, (b) Enter into New Insurance Policies through the Renewal of the Current Insurance Policies or Purchase of New Policies, (c) Maintain Premium Financing Agreements for Insurance Coverage Entered into Prepetition and (d) Enter into New Postpetition Premium Financing Agreements**

41. By this motion, the Debtors seek entry of an order pursuant to Sections 105(a), 363(b), and 364(c) of the Bankruptcy Code authorizing them to (a) continue insurance coverage entered into prepetition, (b) enter into new insurance policies through the renewal of the current insurance policies or purchase of new policies, (c) maintain premium financing agreements for insurance coverage entered into prepetition and (d) enter into new postpetition premium financing agreements.

42. In the ordinary course of business, the Debtors maintain in current effect numerous

insurance policies providing coverage for, among other things, general liability, property, automotive, workers' compensation liability, commercial umbrella and excess liability, fiduciary and criminal liability, inland marine, wrap and directors and officers' liability (collectively, the "Policies"). The Policies are essential to the preservation of the value of the Debtors' business, property and assets and, in many cases, is required by the diverse regulations, laws and contracts that govern the Debtors' commercial activities.

43. For 2011, portion of the Policies is prepaid, the Debtors have financed the remainder of the insurance premiums for the property, general liability, workers' compensation, commercial umbrella, inland marine, and automotive policies, with a down payment and monthly installments. The Debtors believe it is in the best interests of the estates to authorize the Debtors to honor their monthly obligations under the existing premium financing agreements ("PFAs"), to renew the existing PFAs and enter into new PFAs as necessary. By spreading out the cost of the Policies over the applicable coverage period, PFAs provide liquidity advantages as compared to the payment of up-front lump sums for insurance coverage.

44. The Debtors believe that paying outstanding prepetition premium amounts will benefit the estates and creditors by allowing the Debtors' business operations to continue without interruption. The maintenance of the Policies is critical to the preservation of the value of the Debtors' estates, and payment of any unpaid prepetition amounts is necessary to keep the insurance policies in current effect and to ensure that there are not inadvertent lapses in coverage. Accordingly, the Debtors believe it is in the best interest of the creditors and the estates to authorize the Debtors to maintain the Policies.

**Debtors' Motion for Authorization to Continue Using Their Existing Banking System, Bank Accounts and Business Forms**

45. By this motion, the Debtors seek entry of an order an order authorizing them to continue using their existing cash management system, bank accounts, and business forms pursuant to Sections 363, 364, and 507 of the Bankruptcy Code.

46. In the ordinary course of business, Diamond uses a centralized banking system under which funds are collected by Diamond at the store level, transferred to one centralized operating account and disbursed through other accounts to pay operating expenses (collectively, the "Banking System").

47. Each of the 3 Debtors maintains a separate bank account. These accounts would be the "operating account" of each Debtor. In order to efficiently administer the receipts and disbursements, Diamond, in addition to its Operating Account, also has bank 3 accounts for store deposits, a separate "beer account," and a payroll account (collectively, the "Diamond Bank Accounts"). The Debtors' Banking System is managed by the Debtors' administrative personnel at the Highland Home Office, 4805 Sweetwater Road, Highland Home, Alabama 36041. The Banking System enables the Debtors to (a) forecast and report the Debtor s' cash position, (b) monitor collection and disbursement of funds, and (c) maintain control over the administration of the various bank accounts.

48. A detailed description of the existing Bank accounts and new DIP Account are follows:

(A) Diamond Bank Accounts for Store Level Deposits:
WELLS FARGO, ACCT.# 2000052282492
BANK TRUST, ACCT.# 252010889
TROY BANK & TRUST, ACCT.# 4083547

00229666

(B) Diamond Bank Accounts for Company Level Transactions:
FIRST CITIZENS BANK, MAIN ACCOUNT #15003268 (This account will remain open and credit card and store level receipts will continue to be swept into this account. Money will not go out of this account except as a transfer to the DIP Account for "disbursement.")
FIRST CITIZENS BANK, BEER ACCOUNT #15003290
FIRST CITIZENS BANK, PAYROLL ACCOUNT #15003279
FIRST CITIZENS BANK, DIP ACCOUNT #________________

49. The transfer of funds through the Debtors' Banking System is as follows: (a) The Debtors collect cash and cash equivalents at the store locations;(b) All cash and checks received are deposited directly into a designated local Store Account. Electronic receipts paid with credit and debit cards are processed through the Debtors' home office and deposited into the Diamond Operating Account; (c) Funds in the Store Accounts are swept into the Operating Account on a daily basis. Funds are transferred from the Operating Account to the Payroll Account on a bi-weekly basis to cover the Debtors' payroll which pays payroll checks, and payroll taxes; (d) Funds are paid from the Operating Account as necessary to cover payments to vendors, lenders, and other necessary parties.

50. Upon filing the Debtors have opened a new Diamond Quality Stores, LLC DIP Account which after filing will make all disbursements including disbursements to the Payroll Account for further disbursement and to the Beer Account for further disbursement. It is critical to operations to keep the account because credit cards are collected to that account.

51. The Debtors' Banking System is similar to those commonly used by convenience store businesses. The existing Banking System provides numerous benefits, including the ability to (a) forecast and report the Debtors' cash position, (b) monitor collection and disbursement of funds, and (c) maintain control over the administration of the various bank accounts.

**Motion for Entry of an Order (A) Authorizing, But Not Directing, the Debtors to Remit and Pay Certain Taxes and Fees and (B) Authorizing and Directing Banks and Other Financial Institutions to Honor Related Checks and Electronic Payment Requests**

51. By this motion, Debtors seek the entry of an order (a) authorizing, but not directing, them to remit and pay certain taxes and fees and (b) authorizing and directing banks and other financial institutions to honor related checks and electronic payment requests.

52. In the ordinary course of business, the Debtors (a) collect sales taxes and other gasoline taxes from their customers and incur taxes, including, but not limited to, real and personal property and other taxes in operating their business (collectively, the "Taxes") and (b) charge fees and other similar charges and assessments (collectively, the "Fees") on behalf of various taxing, licensing, and regulatory authorities (collectively, the "Authorities") and pay Fees to such Authorities for licenses and permits required to conduct the Debtors' business. The Taxes and Fees are paid to the respective Authorities in accordance with all applicable laws and regulations.

53. The Debtors' failure to pay the Taxes and Fees could have a material adverse impact on the Debtors' business operations in several ways: (a) the Authorities may initiate audits of the Debtors, which would divert attention and limited resources away from the reorganization process; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estates and (c) certain directors and officers might be subject to personal liability, which would likely distract those key employees from their duties related to the Debtors' restructuring.

54. The Debtors estimate that the total amount of prepetition Taxes and Fees owing to the various Authorities will not exceed approximately $200,000.00. The Debtors believe that payment of such Taxes and Fees is appropriate in these Chapter 11 cases. Some of these outstanding tax

liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Authorities. Therefore, the Debtors understand that these funds do not constitute property of the estates and could not otherwise be used by them. In addition, unpaid taxes may result in penalties, the accrual of interest, or both.

55. The Debtors seek the authority, in their sole discretion, to pay the Taxes and Fees without regard to whether such obligations accrued or arose before or after the Commencement Date.

56. The Debtors also request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay all checks presented for payment and to honor all electronic payment requests made by the Debtors related to the foregoing, whether such checks were presented or electronic requests were submitted prior to or after the Commencement Date. The Debtors further request that all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to this Motion.

**Motion for Entry of an Interim Order (I) Authorizing Post-Petition Financing; (II) Authorizing the Debtor's Use of Cash Collateral; (III) Granting Adequate Protection; and (IV) Setting Final Hearing**

57. By this Motion, the Debtors request (i) authorization to obtain post-petition secured financing pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 507 of title 11 of the Bankruptcy Code (the "DIP loan" or "DIP Facility"); (ii) authorizing the Debtors to use cash collateral; (iii) granting adequate protection; and (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001.

58. The DIP loan, as provided for and authorized by the proposed interim and final orders (collectively, the "DIP Orders"), are in summary a revolving loan secured by a floating security

interest on the inventory (including inside store inventory, diesel fuel inventory and regular gasoline inventory) of all of the RPM stores including all former USA Travel stores and all of the Diamond stores. The loan will be paid up and down as the inventory of the stores is increased and decreased. The loan will be used generally to finance all post petition operations and payment of real estate taxes. It is expected that gas purchases will be paid for on a cash basis using the loan when necessary. The terms of the proposed financing are as follows:

a. the Post-petition Revolving Loan Note will have the maximum principal amount of $250,000, with funds to be made available to the Debtors pursuant to an agreed Borrowing Base and compliance with certain requirements.

b . Maturity date March 1, 2012.

c. Pricing: 3% APR.

d. Advance Rates: (i) fifty percent (50%) of inventory (including inside store inventory, diesel fuel inventory and regular gasoline inventory) cost value minus (ii) such reserves (in lieu of or in addition to adjustments to standards of eligibility and advance rates) as may from time to time be established in good faith.

e. Under sections 362(c )(2), (c)(3) and (d) of the Bankruptcy Code, (i) the granting to the DIP Lender as security for the repayment of all amounts owed under the DIP Facilities (the “DIP Obligations”) a security interest in inventory (including inside store inventory, diesel fuel inventory and regular gasoline inventory) of the convenience stores.

f. The modification of the automatic stay under section 362 of the Bankruptcy Code to permit the Debtors to grant certain liens and replacement liens and to perform its obligations and liabilities under the proposed post-petition financing arrangements;

g. The immediate availability of interim funding prior to the entry of any final order; and

h. Scheduling a final hearing on the DIP Motion and establishing notice procedures with respect to the final hearing.

**Basis for Relief**

59. The Debtors have an immediate need to obtain the DIP Facility and to use the Prepetition Collateral, including cash collateral, in order to permit the orderly operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to satisfy other working capital and operational needs, and to pay administrative and professional expenses.

23. The Debtors' use of cash collateral and access to the DIP Facility are necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the maximum value of the Debtors' estates.

60. Prior to the Petition Date the Debtors has tried to borrow money unsuccessfully and has solicited debtor-in-possession financing proposals from other lenders, but were unable to obtain any other form of post-petition financing. The proposed DIP facility was the only post-petition credit proposal the Debtors received.

61. Before determining to enter into the DIP Facility upon the terms of the DIP Documents, the Debtors and the DIP Lender conducted arm's length and good faith negotiations. The Debtors ultimately determined that the proposal for debtor-in-possession financing provided by the DIP Lender was the most favorable under the circumstances, with this process aided by the DIP Lender's status as the Debtors' prepetition lender.

62. Even though the DIP Lender is an insider, the terms set forth in the Interim Order have been negotiated in good faith among the Debtors and the DIP Lender, are fair and reasonable under the circumstances, reflect the Debtors' sound exercise of business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

63. Absent the proposed DIP Facility and the particular security for the repayment thereof recited above, the Debtors will suffer immediate and irreparable harm, and their reorganization effort will be fatally threatened. The Debtors are not able to mount a reorganization effort using cash collateral alone and, in the absence of the post-petition funding provided by the DIP Lender, would be forced to shut their doors and cease operations. These reasons compel the conclusion that approval of the Motion and entry of the DIP Orders is in the best interest of the Debtors and their estates, creditors and parties-in-interest.

64. Post-petition financing under section 364 (c) of the Bankruptcy Code is authorized upon a showing that unsecured credit cannot be obtained. It does not require a debtor to exhaust every possible lending source, but rather to demonstrate that the credit transaction is necessary to preserve the assets of the estate and the terms of the transaction are fair and reasonable under the circumstances. See Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re -11 Snowshoe Co.), 729 F.2d 1085, 1088 (4th Cir. 1986).

65. Since the DIP Facility has been negotiated in good faith and no consideration is being provided to any party to, or guarantor of, obligations arising under the DIP Facility other than as described in the DIP Loan Documents, the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code for all of the reasons set forth herein.

**Arising From Postpetition Delivery of Goods; (ii) Establishing Authority to Pay Certain Expenses in the Ordinary Course of Business; and (iii) Establishing Procedures for Addressing Reclamation Demands**

66. By this Motion, the Debtors seek entry of an order: (i) granting the Vendors administrative expense priority claims under sections 503(b) and 507(a)(2) of the Bankruptcy Code for any undisputed obligations of the Debtors on shipments ordered prepetition and received and accepted by the Debtors after the Commencement Date ("Outstanding Shipments"); (ii) establishing procedures for reconciling claims made by Vendors who make written demands for reclamation of goods shipped prior to the Commencement Date pursuant to §546(c); and (iii) enjoining Vendors or other third parties from taking action to reclaim goods or prevent delivery of goods to the Debtors as a violation of the automatic stay.

67. In order to prevent Vendors' attempts to reclaim goods delivered to the Debtors which will disrupt the Debtors' business, the Debtors request an order authorizing the procedures outlined below for processing and reconciling any reclamation demands ("Reclamation Demands").

68. The Debtors propose that: (a) Any Reclamation Demand must be received by the Debtors no later than twenty (20) days after the Commencement Date at the following addresses: (i) KAUFMAN GILPIN MCKENZIE THOMAS WEISS, PC, 2660 Eastchase Lane, Montgomery, AL 36117, Attention: George W. Thomas, Telephone: (334) 244-1111, Facsimile: (334) 244-1969, gthomas@kgmlegal.com; or at Debtors' address: Diamond Quality Stores, LLC, 4805 Sweetwater Road, Highland Home, AL 36041, Attention Ray McCullough. (b) A Reclamation Demand shall include any information required under the Uniform Commercial Code for such a demand, as well as (i) a statement as to whether the claimant has an administrative claim pursuant to section

503(b)(9) of the Bankruptcy Code (a "503(b)(9) Claim") and (ii) the amount of any 503 (b)(9) Claim. (c) Within one hundred and twenty (120) days of the Commencement Date, the Debtors must advise any Vendor holding a Reclamation Demand (a "Claimant") of the allowed amount of such Reclamation Demand. If any Claimant does not receive notice of an allowed amount, the Debtors are deemed to have rejected that Claimant's Reclamation Demand. (d) Upon a settlement between the Debtors and any Claimant regarding the allowed amount of a Reclamation Demand (a "Settlement"), the Debtors shall be authorized to make payment in the amount of the Settlement, subject to the limitations imposed by any orders of the Court.

**Basis for Relief**

69. The Debtors request the relief in this Motion because it is necessary to prevent serious disruption to the Debtors' business by halting the essential flow of inventory. The Debtors receive shipments of goods on a daily basis. The relief requested herein will prevent the Debtors from having to re-order the Outstanding Shipments in order to assure Vendors of good payment. It will also help the Debtors enforce their rights with respect to goods in transit or goods that are subject to reclamation claims.

70. If the Debtors are forced to address reclamation claims, actions by third parties to reclaim goods or prevent delivery of goods, or re-order Outstanding Shipments in order to assure Vendors of payment, the immediate harm to the Debtors' business could be irreparable. The Debtors would lose customers to competitors who have goods in stock, jeopardizing the Debtors' chances for a successful reorganization. The relief requested is in the best interests of the Debtors, their estates, and creditors because it preserves the Debtors' ability to continue in business as a going concern.

71. Section 503(b)(1)(a) of the Bankruptcy Code allows administrative expense status for

"the actual, necessary costs and expenses of preserving the estate." A vendor can be awarded administrative expense status where it conducts a transaction with a debtor that provides a benefit to the estate. See In re Merry-Go-Round Enterprises, Inc., 180 F.3d 149, 157 (4th Cir. 1999).

72. The Debtors believe that, as a result of filing these Chapter 11 cases, many of the Vendors will refuse to ship goods ordered prepetition over concern about receiving payment. An order granting an administrative priority expense on Outstanding Shipments will alleviate the Vendors concerns and preserve the value of the estates by maintaining the Debtors' businesses.

73. In addition, Bankruptcy Code section 105(a) allows for the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Because of the overlap of 503(b)(9) Claims and reclamation claims, an order for the relief sought herein is necessary to allow the Debtors to fully evaluate any such claims in a timely fashion. Without procedures in place, the Debtors will be forced to expend substantial time separating the different claims. The procedures the Debtors propose will also help prevent double payment for Vendors who make both a 503(b)(9) Claim and a Reclamation Demand.

74. Lastly, section 362 of the Bankruptcy Code prevents parties from taking actions against property of the estate without leave from the Court. To the extent any claimant filing a Reclamation Demand obtains relief from the automatic stay, nothing in the procedures requested herein by the Debtors will prevent any claimant from exercising its rights to reclaim goods pursuant to 546(c) of the Bankruptcy Code. However, even if a vendor possesses a valid reclamation claim, the Court may prohibit a vendor from recovering the goods if the necessity to the debtor outweighs the vendor's need to recover and resell the goods. In re Continental Airlines, Inc., 125 B.R. 415, 417-418 (Bankr. D. Del. 1991). The Vendors will receive an administrative expense priority for the goods if their

need to recover the goods does not outweigh the Debtors' need for the goods in order to reorganize.

75. The Debtors do not waive any rights or defenses to any Reclamation Demand. All such rights or defenses of the Debtors are expressly reserved.

CONCLUSION Accordingly, based upon the facts and reasons stated herein and in each of the first-day applications and motions, I believe it is in the best interests of the Debtors, their estates and creditors and all other parties-in-interest, that the first-day applications and motions be approved.


     Dated: March 2, 2011

                                       < Kendrick Ray McCullough>
                                        Kendrick Ray McCullough


STATE OF ALABAMA         )
COUNTY OF MONTGOMERY   )

I, the undersigned authority, a Notary Public in and for said State at Large, hereby certify that Kendrick Ray McCullough, whose name is signed to the foregoing conveyance and who is known to me acknowledged before me on this day, that, being informed of the contents of the conveyance, (s)he executed the same voluntarily on the day the same bears date.

Given under my hand and seal this the 2nd day of March, 2011.


                              <George W. Thomas>
(SEAL)                           Notary Public
                             My Commission Expires:   7/24/2013

KAUFMAN GILPIN MCKENZIE THOMAS WEISS, PC
P. O. Drawer 4540
Montgomery, Alabama 36103-4540
Telephone: (334) 244-1111
Facsimile: (334) 244-1969

George W. Thomas, Esquire
gthomas@kgmlegal.com

00229666

Leslie H. Pitman, Esquire
lpitman@kgmlegal.com

*Proposed Counsel to the Debtors*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 1st day of March, 2011, a copy of the foregoing Motion and a proposed form of Order were served upon the persons named below via email and upon the twenty-five largest unsecured creditors United States mail, first class postage prepaid.

Teresa Jacobs, Esq.
Bankruptcy Administrator
teresa_jacobs@almb.uscourts.gov

Britt Griggs, Esq.
Attorney for Bankruptcy Administrator
Britt_Griggs@almba.uscourts.gov

Jeff Wegner, Esq.
Kutak Rock LLP
The Omaha Building
1650 Farnam Street
Omaha NE 68102
jeffrey.wegner@kutakrock.com

/s/ George W. Thomas
George W. Thomas

00229666